IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 16, 2025 Session

IN RE AZALAYA J.[1]

**Appeal from the Chancery Court for Knox County**
No. 202159-3          Christopher D. Heagerty, Chancellor

_____

**No. E2024-00767-COA-R3-PT**
_____

This action involves the termination of the parents' parental rights to their minor child. Following a bench trial, the court found that clear and convincing evidence existed to establish statutory grounds of termination as applied to each parent. The court found that termination was in the best interest of the child. We affirm the court's termination decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Andrew Owens Beamer, Knoxville, Tennessee, for the appellant, Samantha Y.

Glenna Walker Overton-Clark, Knoxville, Tennessee, for the appellant, Nathaniel J.

Carolyn Levy Gilliam and James W. Smith, Knoxville, Tennessee, for the appellees, David and Terri C.

**OPINION**

**I.    BACKGROUND**

Azalaya J. ("Azalaya") was born to Samantha Y. ("Mother") and Nathaniel J. ("Father") in March 2017. Azalaya and her half-brother, Kaniel[2] (collectively "the

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

[2] Mother's rights to Kaniel were also terminated in the same proceeding. However, the children were assigned different case numbers and are the subject of different appeals.

Children"), were removed from Mother's care and adjudicated as dependent and neglected on April 23, 2019, as result of substance abuse and criminal issues. The Tennessee Department of Children's Services ("DCS") placed the Children with relatives. The Children were moved from relative to relative until custody was ultimately transferred to David and Terri C., their maternal great aunt and uncle (collectively "Petitioners"), on September 17, 2019. They have remained there since that time.

Mother was provided with therapeutic visitation. These visits were suspended due to Mother's behavior, e.g., Mother pulled her pants down to show the Children her new tattoo and frequently accepted video calls during visitation. Kaniel also advised that he would kill himself if he was forced to continue visitation with Mother. Father's visitation with Azalaya was also suspended, pending his completion of a hair follicle test.

Mother later petitioned for the return of custody in July 2020. The case was continued multiple times without any changes to the custody order. Petitioners filed the instant action on March 31, 2021, in which they sought to terminate Mother and Father's parental rights and to adopt Azalaya based upon the following statutory grounds of termination: (1) the persistence of conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3)(A) and (2) the grounds of failure to visit, failure to support, failure to manifest an ability and willingness to assume custody, and a finding that placement with either parent would pose a risk of substantial harm to Azalaya pursuant to Sections 36-1-113(g)(9)(A)(i), (ii), (iii), and (iv).[3]

The action proceeded to a hearing over the course of several days in June 2022. Evidence presented at the hearing established that Mother did not have a suitable residence available for the Children, that she failed to resolve her criminal issues, that her behavior during visitation was inappropriate, and that the Children showed signs of regression following visitation. Father had also not seen Azalaya since his visitation was suspended.

Kaniel, who was 11 years old at the time of the hearing, testified that he never lived in one place for long while with Mother, that he observed Mother's sexual activities, and that he was aware of her drug use and asked to lie about it. He once observed Mother and Father using drugs. He testified that his youngest sibling died as a result of suffocation when Mother rolled over onto the baby in her sleep. He was asked to lie about this event. He further professed that he was responsible for making his own meals and getting himself ready for school while attending kindergarten. Mother hit him at times and punched him on one occasion. He advised that he did not want to live with Mother and would rather

_____

[3] At the time of the filing of the petition and at the time of the hearing and the termination order, these grounds were only applicable to putative fathers. Effective July 1, 2024, the General Assembly amended Tennessee Code Annotated § 36-1-113(g)(9)(A) by deleting the previous subsection in its entirety and substituting a new subsection providing, inter alia, that termination under this section may also be pursued against any person who is not a legal parent at the time of the filing of a termination petition. *See* 2024 Tenn. Pub. Acts, Ch. 996 § 9 (H.B. 2644). We will address this discrepancy in our analysis.

live with "anyone else" but her. He referred to Mother by her first name. He stated that he played football, was a member of the Boy Scouts, and attended a local Awana program through church. He was happy living with Azalaya in the Petitioners' home.

Jennifer Gray, a licensed professional counselor with a mental health service provider designation, testified that she served as the therapeutic family therapist for the Children and Mother, beginning in 2020 after the Children were placed with the Petitioners. The Children were also receiving individual therapy through the Helen Ross McNabb Center. She recalled that during the first therapeutic visitation with her, Mother asked the Children whether they wanted to see her new tattoo. She advised Mother not to show the Children; however, Mother pulled her pants down past her hips to show them her tattoo. Mother also accepted a FaceTime call during the visitation while with the Children. She coordinated a second therapeutic visitation between the Children and Mother but could not recall the specifics of that visitation. Azalaya "acted out" after the second session and indicated that she did not want to continue with visitation. Kaniel was also having "angry outbursts" and displaying negative behavior after visitation. He stated that he would "kill himself" if had to continue with visitation. She ultimately discontinued therapeutic visitation between Mother and the Children in April 2020.

Ms. Gray stated that she also coordinated therapeutic visitation between Azalaya and Father on two occasions. She did not have "any issues" with his behavior at visitation; however, she was informed that the trial court suspended his visitation in March 2020.

Ms. Gray stated that she continued providing family therapy for the Children with the Petitioners but not with Mother. She professed that Kaniel was assigned to her intern for continued individual therapy but that she provided therapy the week before the hearing. She opined that he was "doing great," had "wonderful" grades, was involved in a lot of activities, and displayed an overall "upbeat and positive" demeanor. She believed that she could successfully discharge him from treatment if he were to remain in his current home; however, she professed that his "mental health would drastically reduce" if he were to return to Mother's care. She held the same opinion for Azalaya, who now does not have any recollection of Mother. She explained that "reintroducing her in her life would do more harm than good."

Deborah Reagan, a Court Appointed Special Advocate ("CASA"), was assigned to the family in March 2019 by the Anderson County Juvenile Court. This was her very first case in her role as a CASA volunteer. She recalled first meeting Mother at a court hearing in April 2019. Mother appeared upset and began "cussing" at her. Mother advised that one of the Children was a "liar." Ms. Reagan testified that she visited the Children in their prior placements and oversaw their final placement with the Petitioners in September 2019. She observed two visits between Mother and the Children in November 2019. Mother was on two different personal cell phones throughout one visit. Her final recommendation was to maintain placement with the Petitioners. Her case was closed in February 2020.

The Petitioners, David and Terri, testified concerning their love and care for the Children. They expressed their intent to adopt should they become available for adoption. They asserted that the Children were doing well in their care and that they had space for them in their residence. They stated that they had also adopted their grandson, who lives in the home with the Children. They claimed that all three children interact as siblings.

Terri testified concerning their transition into the home, explaining that they worked to establish routines and ensured that they received regular medical care. She sought every available form of therapy for the Children. She transported the Children to therapeutic visitation with Mother but was not involved in the actual sessions. She professed that Azalaya was diagnosed with sensory issues and required additional therapy through Tennessee Early Intervention Services.

Terri testified that she was aware of one visit between Azalaya and Father. She recalled that visitation with Father was suspended by the Anderson County Juvenile Court in March 2020, pending his completion of a hair follicle test. She agreed that she received a lump sum of child support each month from the three parents involved—Mother, Father, and Kaniel's father. She was unsure how much was contributed by each parent.

Terri testified that they petitioned for termination and adoption because the parents had not made contact in over a year. She wanted to provide permanency for the Children. She acknowledged that Mother and Father dropped gifts with the guardian ad litem a few years ago. The clothes provided were the wrong sizes, and they had hid notes to the Children throughout the packages. Terri acknowledged that Mother was not welcome in her home as a result of Mother's continued theft of her property.

Mother testified that she was current with her child support obligation at a rate of $100 per month. She obtained a residence and employment, attended individual counseling, and completed an intensive outpatient treatment program. She filed a petition for custody in July 2020, which was reset multiple times and never heard by the court prior to the instant action. She likewise contacted Ms. Gray but never received a response.

Mother testified that she had two vehicles at the time of the hearing and identified pictures of her two-bedroom trailer and stated that she had a queen size bed, a twin bed, and a toddler bed available for the Children.[4] She acknowledged that she held a month-to-month lease for her current residence at a rate of $400 per month but asserted that she has lived in the same residence since July 2019, approximately three years. She earned an annual income of approximately $7,000 through her part-time employment in 2021. She intended to apply for disability benefits because of her past diagnoses of post-traumatic stress disorder, attention deficit hyperactivity disorder, and anxiety but did not have a current medical diagnosis to use a basis for her disability application. She believed she

_____

[4] The pictures presented were two years old at the time of the hearing.

- 4 -

could support herself sufficiently through her part-time employment and opined that there were plenty of extra jobs she could obtain to earn money. She acknowledged that she still had some pending criminal charges and agreed that she committed some of her criminal offenses while the Children were in her care. She alleged that she immediately quit using marijuana when the Children were removed.

Father testified that he was ordered to submit to a hair follicle screening on March 20, 2020. He submitted to the screening on that day but never heard anything further after the courts closed due to COVID-19.

The trial court issued an order terminating Mother and Father's parental rights on May 13, 2024. As to Mother, the court based its termination decision upon (1) the persistence of conditions which led to removal; (2) failure to manifest an ability and willingness to assume custody; and (3) a finding that placement with Mother would pose a risk of substantial harm to Kaniel. As to Father, the court based its termination decision upon his (1) failure to manifest an ability and willingness to assume custody and (2) a finding that placement with Father would pose a risk of substantial harm to Azalaya. The court denied termination as to both parties based upon the alleged grounds of abandonment[5] and held that the ground of persistence of conditions was inapplicable to Father because Azalaya was not removed from his custody. The court found that termination of each parent's rights was in the best interest of Azalaya. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether the court abused its discretion in its admission of evidence.

B.    Whether the court abused its discretion in its designation of a witness as an expert.

C.    Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

D.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of Azalaya.

---

[5] Petitioners assert that the trial court sustained the ground of abandonment for failure to visit as to Father. Our review of the order indicates that the trial court ultimately determined that Petitioners failed to sustain the grounds of failure to support and to visit by clear and convincing evidence as applied to Mother. The trial court did not issue any findings of fact on these grounds as applied to Father. While the court found that the evidence presented established Father's willful abandonment, this finding was made in relation to the ground of Father's failure to manifest an ability and willingness to assume custody.

- 5 -

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION

### A.

Mother argues that the court erred in its admission of reports generated by Ms. Reagan. She claims that the CASA reports were inadmissible hearsay because they were generated for the purpose of litigation. She also suggests that testimony presented by Ms. Reagan should be stricken from the record. "Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). "The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion." *Id.* Improper admission

or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

The record reflects that the CASA reports contained information pertaining to Mother's visitation with the Children, Ms. Reagan's interactions with the parties, and the transfer of custody between relatives. These records were maintained in accordance with DCS's internal procedures and properly admitted pursuant to Rule 803(6) of the Tennessee Rules of Evidence as an exception to the hearsay rule in that the reports are of

> acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness[.]

Further, Ms. Reagan testified as to her personal interactions with Mother and her observations concerning the transfer of custody from relative to relative. Her testimony was relevant and admissible.[6] This issue is without merit.

### B.

Mother next objects to the trial court's designation of Ms. Gray as an expert witness. Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263–64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *Ballard*, 855 S.W.2d at 562. "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 230 (Tenn. Ct. App. 1999). The Tennessee Supreme Court has explained that a court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *McDaniel*, 955 S.W.2d at 265.

The record reflects that Ms. Gray received her undergraduate psychology degree from the University of Tennessee, Chattanooga in 2005; that she received her graduate

---

[6] Relevant evidence is defined by Rule 401 of the Tennessee Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

degree from Argosy University in Nashville, Tennessee in 2009, which was once an accredited university; that she received her license in 2019; that she has testified approximately 20 times as an expert witness in her field as a licensed professional counselor with a mental health service provider designation; and that no court had ever declined her admissibility as an expert witness. In consideration of the foregoing, we conclude that the evidence supports the trial court's discretionary determination to qualify Ms. Gray as an expert witness in her field.

C.

As indicated above, the court granted the termination petition as to Mother based upon the following statutory grounds: (1) the persistence of conditions which led to removal; (2) failure to manifest an ability and willingness to assume custody; and (3) a finding that placement with Mother would pose a risk of substantial harm to Azalaya. The court granted the termination petition as to Father based upon (1) his failure to manifest an ability and willingness to assume custody and (2) a finding that placement with Father would pose a risk of substantial harm to Azalaya. We will consider each ground as applied to each parent as required by our Supreme Court. *See In re Carrington H.*, 483 S.W.3d at 525–26 ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

1.     Persistence of conditions

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable,

and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

The record reflects that the conditions which led to removal in April 2019 were child safety concerns due to substance abuse and criminal issues. Mother had not fully cleared her criminal history by the time of the hearing. The trial court found that Mother's testimony on this ground vacillated and that her testimony as a whole lacked credibility. "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012).

The record provides no such clear and convincing evidence that the trial court erred in its credibility assessment. Further, other conditions exist that would cause further abuse and neglect, namely Mother has failed to establish her ability to financially support Azalaya on a long-term basis. Azalaya indicated that she no longer wanted to visit with Mother shortly after removal. Testimony indicated that she no longer had any recollection of Mother. Mother also exhibited a pattern of harmful behavior in front of Azalaya's older brother, e.g., her use of illegal substances in his presence, her encouragement of him to lie to law enforcement, and her exposure of Kaniel to her sexual activity. Following our review, we conclude that there is little likelihood that these conditions will be remedied at an early date so that Azalaya can be safely returned in the near future and that the continuation of the parent's relationship greatly diminishes her chances of early integration into a safe, stable, and permanent home. Accordingly, we affirm the trial court on this ground of termination.

2. Tennessee Code Annotated sections 36-1-113(g)(9)(A)(iii), (iv)

Prior to July 1, 2024, Tennessee Code Annotated section 36-1-113(g)(9)(A) provided, in pertinent part, as follows:

The parental rights of *any person who*, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, *is the putative father of the child* may also be terminated based upon any one (1) or more of the following additional grounds:

- 10 -

(iii)    The person has failed to manifest an ability and willingness to assume legal and physical custody of the child; [or]

(iv)    Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

(Emphasis added.).

## *Mother*

This section was only applicable to putative fathers prior to July 1, 2024. Consideration of these grounds of termination as applied to Mother was error. However, this conclusion does not end our inquiry because only one ground of termination must be established by clear and convincing evidence to justify termination of parental rights. Tenn. Code Ann. § 36-1-113(c).

## *Father*

As to the first ground, the statute permits termination based upon a parent's failure to exhibit either (1) the failure to manifest an ability to assume custody *or* (2) the failure to manifest the willingness to assume custody. *See generally In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (addressing the requirements of Section 36-1-113(g)(14)). Here, Father did not evidence an ability or willingness to assume custody of Azalaya. Father's contact with her was suspended due to allegations of drug use and manufacture. The court directed Father to submit to a hair follicle screening and petition the court to modify visitation following a clear screening. While Father submitted to the screening, he never made any further attempts to pursue visitation. We agree with the trial court that Father's failure to pursue visitation was evidence of willful abandonment and indicative of his overall lack of an ability and willingness to assume custody. We affirm this ground of termination as applied to him.

As to the second ground, whether placing Azalaya in his custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a

reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)). Our review indicates that placing Azalaya with him would pose a risk of substantial harm to her psychological welfare given the absence of any relationship between Father and Azalaya. Azalaya is well adjusted in her current placement with her sibling and other relatives and has not seen Father since visitation was suspended in March 2020. We affirm this ground of termination as applied to him.

D.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination as applied to each parent, we must consider whether termination was in Azalaya's best interest. Effective April 22, 2021, the General Assembly amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, inter alia, 20 factors to be considered in determining whether termination is in the child's best interest. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). The amended statute does not apply to this action, filed on March 31, 2021. *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022) *perm. app. denied* (Tenn. Mar. 17, 2022).

The following non-exhaustive list of factors are applicable to this action:

> (i)      In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[7]

---

[7] *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that the court must take the child's perspective, rather than the parent's).

*Mother*

Mother did not make such an adjustment of circumstances that would ready herself for Azalaya's return. Tenn. Code Ann. § 36-1-113(i)(1). Mother did not maintain regular

- 13 -

visitation and has not otherwise established a meaningful relationship with Azalaya.  Tenn. Code Ann. § 36-1-113(i)(3), (4).  Meanwhile, Azalaya is in a home with relatives who wish to adopt her and her sibling.   A change of caretakers at this point would be emotionally detrimental to Azalaya, who exhibited signs of regression following visitation and expressed a desire to stop visitation with Mother.  Tenn. Code Ann. § 36-1-113(i)(5). Testimony established that Mother hit Azalaya's sibling on occasion and exposed him to her sexual activity.  Tenn. Code Ann. § 36-1-113(i)(6).  Questions remain as to Mother's ability to provide a safe and stable home for Azalaya.  Tenn. Code Ann. § 36-1-113(i)(7). Mother admitted that she was not taking medication for her anxiety and depressive disorders and was not currently under the care of a therapist.  Tenn. Code Ann. § 36-1-113(i)(8).  Azalaya should be permitted to achieve permanency in her current placement with her family.  With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of Azalaya.

## *Father[8]*

Father did not maintain regular visitation and has not otherwise established a meaningful relationship with Azalaya.  Tenn. Code Ann. § 36-1-113(i)(3), (4).  Meanwhile, Azalaya is in a home with relatives who wish to adopt her and her sibling.   A change of caretakers at this point would be emotionally detrimental to Azalaya, who has not seen Father since 2020.  Tenn. Code Ann. § 36-1-113(i)(5).  Questions remain as to Father's ability to provide a safe and stable home for Azalaya as evidenced by his failure to submit a clear drug screening for the court's consideration.  Tenn. Code Ann. § 36-1-113(i)(7). Moreover, Azalaya should be permitted to achieve permanency in her current placement with her family.  With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of Azalaya.

## V.    CONCLUSION

The judgment of the trial court is affirmed as modified.  The case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed equally to the appellants, Samantha Y. and Nathaniel J.

_____
JOHN W. McCLARTY, JUDGE

---

[8] The record reflects that the trial court used the new, expanded factors in determining whether termination of Father's parental rights was in the best interest of Azalaya.  This error does not necessitate reversal because the new factors incorporated the old factors that are applicable in this action.  However, our de novo review will consider the old factors as applied to Father.